1

1        UNITED STATES DISTRICT COURT
                 DISTRICT OF COLORADO
2

3   UNITED STATES OF AMERICA,    .   Case No. 20-cr-00164-CMA-
                                 .              JMC-1
4            Plaintiff,          .
                                 .
5   vs.                          .   LaPlata County Courthouse
                                 .   1060 East Second Street
6   BENJAMIN DAVID HARBIN,       .   Durango, CO  81301
                                 .
7            Defendant.          .   October 15, 2020
    . . . . . . . . . . . . . .  .   12:33 p.m.
8

9       **TRANSCRIPT OF TELEPHONIC MOTION HEARING HELD BEFORE THE
    HONORABLE JAMES M. CANDELARIA, UNITED STATES MAGISTRATE JUDGE**

10  APPEARANCES:

11  For the Plaintiff:            U.S. Attorney's Office-Denver
                                  By:  Alecia Lynne Riewerts
12                                1801 California Street
                                  Suite 1600
13                                Denver, CO  80202
                                  (303) 454-0100
14

    For the Defendant:            Griff, Larson, Laiche & Wright
15                                By:  Stephen L. Laiche
                                  422 White Avenue
16                                Suite 323
                                  Grand Junction, CO  81501
17                                (970) 245-8021

18  Also Present:                 Megan Dibsie
                                  Jessica Botkin
19

    Court Recorder:               Clerk's Office
20                                U.S. District Court
                                  1060 East Second Street
21                                Durango, CO  81301

22  Transcription Service:        AB Litigation Services
                                  216 16th Street, Suite 600
23                                Denver, CO  80202
                                  (303) 296-0017
24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                                    INDEX

2

3   WITNESS                Direct     Cross    Re-Direct    Re-Cross

    JESSICA BOTKIN
4
    By Mr. Laiche          7                      30
5   By Ms. Riewerts                  24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Time noted:  12:33 p.m.)

 2            THE COURT CLERK:  All rise.

 3            THE COURT:  Good afternoon.  Please have a seat.

 4            All right.  The record commences this 15th day of

 5   October 2020.  The Court calls case United States of America

 6   versus Benjamin David Harbin.  This is Case Number 20-cr-

 7   00164.

 8            May I have entrances of appearance, starting with

 9   the government?

10            MS. RIEWERTS:  Good afternoon, Your Honor.  Alecia

11   Riewerts on behalf of the United States.

12            THE COURT:  Good afternoon, Ms. Riewerts.

13        (Brief pause)

14            THE COURT:  Mr. Laiche?

15        (Brief pause)

16            THE COURT:  Can you hear us?

17            MR. LAICHE:  Yes, Your Honor.  We can hear you.

18            THE COURT:  I need to have you make an entrance of

19   appearance, please.

20            MR. LAICHE:  Thank you.  Stephen Laiche on behalf

21   of Mr. Harbin, who is appearing from the Rio Blanco County

22   Jail.

23            THE COURT:  All right.  Good afternoon.

24            Mr. Harbin, can you hear us?

25            MR. HARBIN:  Yes, sir.
```

1           THE COURT:  All right.

2           And then I'll ask those who are not speaking to

3    mute yourself so we can (unintelligible) the feedback.

4           All right.  Then we also have, is it Megan Dibsie

5    of probation?

6           MS. DIBSIE:  Yes, Your Honor.

7           THE COURT:  All right.

8           MS. DIBSIE:  Good afternoon.

9           THE COURT:  Good afternoon.

10          All right.  We are scheduled -- we have a hearing

11   scheduled today on the Defendant's motion for the Court to

12   reconsider.  It's detention order of April 6, 2020, and that

13   is Document 34.  The Court has reviewed the motion.

14          And let me ask the government, Ms. Riewerts, have

15   you had an opportunity to review the defendant's motion?

16          MS. RIEWERTS:  Yes I have, Your Honor.

17          THE COURT:  And it's the government's position

18   that it opposes the defendant's motion?

19          MS. RIEWERTS:  Your Honor, the government does not

20   oppose the defendant's motion in that he is asking to reopen

21   the hearing.  At the initial detention hearing the defendant

22   had waived detention, and the defendant was pursuing a

23   placement in the Caprock facility and was trying to finalize

24   funding for that placement.  The government stated at that

25   time that it would consider that new information for purposes

1  of reopening the hearing, though the government opposes the

2  motion in the sense that the government -- the government's

3  position is still that detention is the only appropriate

4  placement for the defendant (unintelligible) trial in this

5  case.

6          THE COURT:  Okay.  All right.  Well, thank you for

7  that clarification.

8          All right.  Then, Mr. Laiche, this is your motion

9  for reconsideration, so if you're prepared to proceed, you

10  may proceed.

11          MR. LAICHE:  We are, Your Honor.  And we have one

12  witness, Doctor Jessica Botkin.  I don't know if you want to

13  proceed by way of just letting Doctor Botkin make a proffer,

14  or would you want to proceed of question and answer.  Either

15  way, if Ms. Riewerts has any questions following Doctor

16  Botkin's testimony I don't object to Ms. Riewerts asking him

17  questions.

18          THE COURT:  Well, the Court will conduct it as

19  though we were having an in conference -- in court hearing.

20  So I would ask that you call your witness and I will put the

21  witness under oath.  You can directly examine her, and if Ms.

22  Riewerts has any cross-examination we'll go from there.

23          MR. LAICHE:  Thank you.

24          MS. RIEWERTS:  Your Honor, (unintelligible) to

25  briefly interrupt and let Your Honor know in the event that

1  this will change the manner in which the proceeding would go

2  forward.   The government had intended to proffer information

3  to the Court related to detention.   I provided all the

4  information I (unintelligible) to Mr. Laiche yesterday, and

5  he does not intend to oppose that proffer of information.

6         And with regard to the case, Special Agent Alex

7  Zappe has called in, the FBI agent who was the case agent for

8  the case, he's called in incase there are any questions that

9  Your Honor has that -- that I am not able to address.   But I

10 did want to bring that to Your Honor's attention prior to

11 proceeding.

12        THE COURT:   All right.   Well, I'll still proceed

13 with Mr. Laiche calling his first witness, and then once he

14 has rested I will let the government make its proffer to the

15 Court.   And if I have any questions we can go from there.

16        All right.   So, Mr. Laiche, you may call your

17 first witness.

18        MS. RIEWERTS:   Thank you.

19        MR. LAICHE:   Certainly, Your Honor.   We call

20 Doctor Jessica Botkin; B-O-T-K-I-N.

21        THE COURT:   All right.   Doctor Botkin, if you

22 could please raise your right hand?

23        Do you solemnly swear or affirm that the testimony

24 you're about to give in these proceedings is the truth, the

25 whole truth, and nothing but the truth, under the pains and

1    penalties of perjury?

2            MS. BOTKIN:  Yes, sir.

3        Whereupon,

4                    JESSICA BOTKIN

5        was duly sworn.

6            THE COURT:  All right.  And if you would please

7    state your full name for the record?

8            THE WITNESS:  Jessica Botkin; B-O-T-K-I-N.

9            THE COURT:  All right.  Mr. Laiche, you may

10    proceed.

11            MR. LAICHE:  Thank you, Your Honor.

12                    DIRECT EXAMINATION

13        BY MR. LAICHE:

14        Q.    Doctor Botkin, can you please tell us what you do

15    and why you're here?

16        A.    Yes.  I am the director of Caprock Behavioral

17    Services.  So I guess what Caprock is?

18        Q.    Yeah.

19        A.    Caprock is a long-term residential treatment

20    program.  We specialize in serving adult males who have

21    disabilities who have also committed various sexual offenses.

22    We are a long-term placement.  We have been around for

23    roughly 27 years.  Our program was developed based on the

24    need for this specialized population of (unintelligible)

25    disabilities, and also have committed these offenses, being

1    that community-based, unsupervised placement wasn't

2    appropriate, prison wasn't appropriate, so this program was

3    developed to ensure that we provided them with the least

4    restrictive setting possible, still while maintaining

5    community safety.

6              We operate off of a correctional model, as well.

7    So we provide a secure facility, secure residential settings,

8    providing direct line of sight, 24-hour direct line of sight

9    and close supervision.  We're an all-encompassing program in

10   that we also provide on-site sex offender specific treatment.

11        Q.   Okay.  Well, can you tell us a little bit about

12   your educational background --

13        A.   Yes.

14        Q.   -- and your experience?

15        A.   Yes.  So I have a bachelor's degree in psychology,

16   a master's degree in clinical mental health.  I'm a licensed

17   professional counselor.  I am just finishing my doctorate in

18   clinical psychology.  I am also a full operating treatment

19   provider with the Sex Offender Management Board.  I also hold

20   a DD specialty, and I am a clinical supervisor for the Sex

21   Offender Management Board in that I supervise other

22   therapists.

23        Q.   Okay.  Would you explain what DD specialty means?

24        A.   Yes.  So that means that we have been educated and

25   have experience working with individuals who have been

1   diagnosed with some form of intellectual or developmental

2   disability to provide them with sex offense specific

3   treatment in a manner that is more suited for their cognitive

4   abilities.  So it's a very -- it's a very specialized

5   approach to taking, because we understand that not everybody

6   is not going to be as receptive or understanding to the

7   normal sex offender treatment modalities.

8        Q.   And you talked (unintelligible) SOM certified,

9   would you explain that?

10       A.   So I am a full operating SOM certified provider,

11  which means that I've been doing this for roughly eight

12  years.  I have gone through the various levels to where I can

13  do this independently.  I have taken a lot of classes,

14  attended a lot of education, have been supervised and spent a

15  lot of hours actually conducting treatment, and so now I'm at

16  a point also where now I supervise other people.

17       Q.   Okay.  Now, Doctor Botkin, I'm going to show you

18  what we've marked as Exhibit 1.

19            MR. LAICHE:  It was attached to my motion, Your

20  Honor, as Exhibit 1.

21            THE COURT:  All right.  Ms. Riewerts, do you have

22  any objection?

23            MS. RIEWERTS:  No, Your Honor.

24            THE COURT:  All right.

25            BY MR. LAICHE:

1        Q.    Did you write Exhibit 1?

2        A.    I (unintelligible).

3        Q.    Now, let's talk a little bit more about Caprock

4   specifically.

5        A.    Okay.

6        Q.    How long has it been in existence?

7        A.    Since 1993.

8        Q.    And at this -- what -- why was it developed?  Who

9   are the persons that are typically your Caprock clients?

10       A.    So we were developed, or we started early on with

11  this identified need that there are individuals in the

12  community who have disabilities that also commit sexual

13  offenses and that there was -- it was -- it was deemed it was

14  actually a county issue that there was not an appropriate

15  placement for these guys where they could remain safe, as

16  well as ensure that they were not victimizing any other

17  individual.  Other developmental disability programs weren't

18  able to manage that.  They didn't have the qualifications to

19  understand the sexual offending piece.  Prison was not a good

20  alternative because with that lower cognitive functioning

21  these guys are often placed in situations where they can be

22  victimized to themselves.  They also struggle with social

23  interaction and sometimes their criminal behavior would

24  increase just because of not understanding.  So, really, this

25  program was developed just for this unique population.  We

1   are the only one in the states that does this, and I think

2   it's very -- there's maybe a couple of others across the

3   country.  So it's a very unique program.

4        Q.   How is it funded?

5        A.   We receive funding through the state.  Individuals

6   placed here receive Social Security benefits which cover the

7   cost of their living to reside at Caprock.  Otherwise, they

8   are deemed eligible through the state on what's known as a

9   "DD waiver" which provides them with long-term residential

10  services.

11       Q.   Now, when you say long-term residential facility,

12  explain what that means.

13       A.   So I have some individuals currently who have been

14  here since day one, so they've been with us since 1993.  And

15  I assure you they will be with us for the rest of their

16  lives.

17       Q.   Uh-huh.

18       A.   We have had some that have gone on to other

19  agencies.  But truly, it's -- it's a long-term -- a long-

20  term, lifetime, often placement.

21       Q.   Are there security measures?

22       A.   Yes.  So we are a 24-hour line of sight and close

23  supervision program.  We have very small groups of people so

24  that our staff are capable of monitoring them at all times.

25  Each residence of the facility is equipped with alarms on all

1    doors and windows.  We have cameras, audio and video, inside

2    the residence, as well as outside, to monitor all the

3    whereabouts, and if anybody were to attempt to leave the

4    property or go outside we're notified immediately by an alarm

5    being triggered.

6            Q.    Would you categorize it as a secure facility?

7            A.    I would.

8            Q.    Now, how many staff do you have?

9            A.    So our -- we try to keep our ratios very small, so

10   within the residence we have three individuals to one staff

11   member at all times.  During day program we have anywhere

12   from five to six staff there supervising throughout the day.

13           Q.    Now, you mentioned 24-7 line of sight supervision,

14   will you explain that?

15           A.    So that means that every day, be it at home or at

16   our day program facility, they are receiving direct, like I

17   am visually looking at this individual.  The only time that I

18   wouldn't be within an eyeshot would be is if they are in the

19   restroom or they are in their bedroom.  Otherwise, they are

20   always in constant view of a staff member.

21           Q.    And how large is your staff?

22           A.    We have -- oh, I'm sorry.  (Unintelligible) 25, 30

23   employees.

24           Q.    Okay.  And how many clients do you have?

25           A.    Twenty-three.

1    Q.   So the staff is larger than the client base.

2         Now, what, in terms of access to funds, do your

3    clients have (unintelligible) to any money?

4    A.   No.  So Caprock will become the representative

5    payee, so all of their Social Security benefits will come and

6    be deposited.  Their name will be on an account, but Caprock

7    manages it.  So Caprock is responsible for helping them

8    manage and budget their money.  We keep possession of their

9    debit cards, cash, and checks, so there is -- there is never

10   an opportunity for anybody to have that on their person.

11   Q.   Are your clients allowed to leave the facility

12   unattended?

13   A.   No.  So they are required, with that 24-7 line of

14   sight supervision, anytime they would go to the community --

15   into the community in any way, they are always with a staff

16   member.  And that goes for medical appointments, even if we

17   were to take them out to get like needs, you know, hygiene

18   shopping, they're always with a staff member.

19   Q.   And then does that mean you're not allowed a

20   vehicle if you're a Caprock client?

21   A.   Correct.  So we don't allow any public

22   transportation, or they don't drive independently, either.

23   So we'll make sure that we take them to and from everywhere

24   they need to be.

25   Q.   Okay.  What about telephone calls?

1    A.   So all phone calls will be monitored.  Each

2  individual that is at Caprock is assigned to a case manager

3  and is only permitted to make phone calls on the day their

4  case manager works, just to make sure that they're calling

5  approved people.  What we do is we use a Caprock phone.  We

6  put it on speaker, and that individual is able to talk to

7  whomever.  We supervise all phone calls to ensure that the

8  content is appropriate, that they are not discussing things

9  they shouldn't be that would, you know, be inappropriate --

10   Q.   Uh-huh.

11   A.   -- asking for things that they shouldn't be in

12 possession of.  So it's always -- there's always somebody

13 there monitoring that discussion.

14   Q.   Okay.  What about visitors, are Caprock clients

15 allowed visitors?

16   A.   They're allowed visitors, approved visitors.  So

17 we will have a list of who is able to come and visit with

18 them.  Those visits also occur on site and they are either

19 supervised with somebody in there initially.  They are also

20 in a room where there is audio and video surveillance with

21 that, too.  So even if somebody steps out, there is still

22 supervision.

23   Q.   Okay.  Now, with regard to Benjamin Harbin, have

24 you reviewed any documents?

25   A.   I have.  I have reviewed his psychosexual

1   evaluation, the affidavit, the indictment papers.  I've also

2   spoken with Candace Dow (phonetic), the probation officer

3   here in Mesa County, and I have spoken with his mother also

4   for collateral.

5           Q.    Uh-huh.  Now, so you -- so you understand Mr.

6   Harbin's offenses are utilized these (unintelligible)

7   electronic device --

8           A.    Correct.

9           Q.    -- of somehow.  Do you have any clients currently

10  at Caprock who are charged with the same or similar offenses?

11          A.    I do.  I have a handful.

12          Q.    A handful means?

13          A.    Four to five.

14          Q.    All right.  Well, let me give you -- now, let me

15  ask you this, then.  Do you think Mr. Harbin is appropriate -

16  - is an appropriate candidate for the Caprock facility?

17          A.    I do.  After reviewing his information I believe

18  that he truly does fit the mold of Caprock.

19          Q.    Uh-huh.

20          A.    That's based on his cognitive functioning, as

21  well.  His areas of concern and the offense history, we have

22  a lot of experience with working with that population.  The

23  structure that Caprock can provide I think is beneficial for

24  him, and the way we conduct our treatment, I do think he's

25  appropriate.

 1        Q.    Now, has Mr. Harbin been approved for financing

 2   through Social Security or the State Developmental Agency?

 3        A.    He has.  I confirmed that last week.  He has been

 4   approved for placement on that DD waiver, which makes him

 5   eligible to be placed at Caprock.

 6        Q.    Because I am looking at, there was a bail report

 7   provided April (unintelligible) or written April 1st of 2020,

 8   and there were some concerns about a payment and acceptance

 9   into the Caprock facility.  Have you verified with Social

10   Services, or with Mesa Developmental Services, that Mr.

11   Harbin -- that he will have funds to attend your program?

12        A.    Yes, I have.  And he -- it has been confirmed that

13   he is eligible for that.

14        Q.    Now, I notice that Mr. Harbin now has been

15   prescribed Citalopram.

16        A.    Uh-huh.

17        Q.    And do -- can you tell us a little bit about

18   Citalopram?

19        A.    So all of -- for him, and I don't want to speak

20   too much because I don't know the extent of his mental health

21   issues and why that was prescribed, so I don't want to

22   overstate --

23        Q.    Uh-huh.

24        A.    -- or speak out of turn.  I can say that we do

25   have a lot of individuals who take similar medication, or

 1   that exact medication, and it is -- has proven to be quite

 2   effective.  We do work very closely with a psychiatric team

 3   to make sure that those medications are reviewed frequently

 4   and managed and any adjustments would be made as needed to

 5   that.

 6         Q.   Okay.  Can you explain to the judge what a typical

 7   day for a client, or for Mr. Harbin, would be at the Caprock

 8   facility?

 9         A.   Yeah.  So Monday through Friday, 9:00 to 4:00, we

10   operate a day program where he would come with the other

11   individuals in the program, as well.  And we usually start

12   the day working on some academic things to help with those

13   lower cognitive skills, life skills.  We do a lot of

14   activities and educational components, but this is also where

15   he would attend his offense specific treatment.  We do on-

16   site treatment, and we do them in small groups so that it's

17   more effective and (unintelligible) to their needs.  So we do

18   that every week, so he would participate in group therapy.

19              Our treatment provider also comes in and does

20   educational groups throughout the week in small group

21   settings, too, and that typically supports, kind of, the

22   philosophies and things that are discussed within that

23   treatment.

24              We also, as an agency, provide educational groups

25   where we do a lot of problem solving, you know, challenging

1    some, you know, I guess, deviant thoughts and behaviors.  So

2    it's really, they get a lot of wraparound services, not just

3    the treatment.  So we do that throughout the day.

4          We also provide an opportunity for them to earn

5    some money, if the person is eligible.  We operate a yard

6    crew where it's 100 percent supervised in small groups where

7    they can get out in the community and earn some income, but

8    it is supervised.

9          And then in the evenings, they go home and they,

10   you know, have chores.  We really try to instill

11   responsibility, so there's different things that they'll have

12   to do.  They're often given homework through treatment, so

13   they'll work on homework.  Then they have some free time.

14         In the evenings our staff also do what's called

15   "roundtable" where we sit around and we discuss how the day

16   went, any challenges that they're having in treatment, any

17   behavioral issues and concerns.  And then, usually, it's off

18   to bed and then it starts all over again.

19         The weekends, usually they're at home.  Again, we

20   do a lot of roundtable --

21        Q.    When you say "home" you mean --

22        A.    Their residence.

23        Q.    Okay.

24        A.    Yeah.

25        Q.    The facility, not --

1       A.    Yes.

2       Q.    Okay.

3       A.    Yes.  So, yeah, so sorry if that wasn't clear.

4       So our day program is at a separate location than the

5  residence.  So the home that he would be placed in is a --

6  yeah, it's separate.

7       Q.    Now, is then, the home or the house, is that

8  equipped with the security systems --

9       A.    It is.

10       Q.    -- and the cameras?

11       A.    It is.

12       Q.    And is there any internet access at anywhere -- at

13  any facility in Caprock?

14       A.    So there would not be any internet access that he

15  would be able to be able to utilize.  Our staff obviously

16  have to do their work, but that is confined to their staff

17  office, which is behind locked doors.  They also are all

18  password-protected and locked.  So there would be no way,

19  without any type of an electronic device, for him to have any

20  access to the internet.

21             And knowing that this is part of his offense

22  history, we would not support giving him a device like a

23  laptop or anything to where he could use that.

24       Q.    Now, are you aware of Mr. Harbin's prior offenses?

25       A.    Yes.

1        Q.    And were you -- are you aware of the probation

2   protocol, or whatever treatment protocol he was on --

3        A.    Yes.

4        Q.    -- with those?

5        A.    Yes.

6        Q.    Tell me how Caprock will be more effective than

7   what probation protocol he had before.

8        A.    So Caprock has a few individuals currently that

9   are on probation who have similar ones, and we work very

10  closely with the probation department, so we will make sure

11  that we enforce all of those things.

12        Aside from that, we also do what's called a

13  "rights modification" and that removes some of those rights

14  to where he would have access to certain properties, access

15  to go certain places in the community to obtain things like a

16  cell phone, to be able to eliminate that opportunity for him

17  to have that access.

18        We're very structured and, I guess, restrictive,

19  which would be different.  I see the main difference as that

20  he wasn't in a setting -- although he had probation, he

21  wasn't in a setting that could continually provide that --

22  those level of restrictions.  There will be somebody with

23  them all the time to make sure that those probation

24  requirements are enforced, on top of the policies that we

25  also instill.

1          We also adhere to the guidelines from the Sex

2    Offender Management Board and follow what those restrictions

3    for supervising sex offenders are, also.

4          Q.   Now, you mentioned you spoke to Candace Dow.

5          A.   Yeah.

6          Q.   Who is she?

7          A.   She is the probation officer for Mesa County.  She

8    is currently the probation officer for all of the clients

9    that we have at Caprock.

10         Q.   Is Mr. Benjamin Harbin one of her clients?

11         A.   To my knowledge, yes.

12         Q.   Does she endorse Mr. Harbin's placement to

13   Caprock?

14         A.   Yes.

15         Q.   Now, what happens if any of your clients, or Mr.

16   Harbin specifically, violates the terms or the agreements of

17   Caprock, or of his bail, or of his probation?

18         A.   So we would immediately notify the probation

19   officer, as well as contact law enforcement.  And in most

20   cases those -- the placement would be revoked, and he would

21   be resentenced, and potentially, you know, have additional

22   placement or charges.

23         Q.   Now, I want to give you a hypothetical.  If Mr.

24   Harbin were a Caprock client, would it be possible for him to

25   obtain another cell phone or obtain an internet device and

1  recommit other circumstances or other actions like he's done

2  in his first two cases, and what he's been charged with in

3  this case?

4       A.   I can confidently say that with the restrictions

5  and regulations that we have put in place, and those

6  safeguards with requiring that we have 24-hour supervision,

7  line of sight, he's never able to go into the community

8  without supervision, he doesn't have access to funds, he

9  doesn't have access to internet even be able to order

10  anything, isn't able to go out into the community alone,

11  doesn't have transportation, I would confidently say that the

12  chances of him obtaining any type of electronic device to

13  access the internet is nonexistent.

14       Q.   Okay.

15       A.   Unless somebody were to, you know, bring him

16  something.  But we go through all of their personal property,

17  so even then I don't see any way that that whatever happen.

18            We've never had it with the other individuals who

19  are very similar and have similar charges, there has never

20  been an opportunity and nothing has ever occurred where they

21  have ever become in possession of any electronic device.

22       Q.   Now, are you familiar with Mr. Harbin's

23  psychiatric history and, you know, probation cases?

24       A.   I am to some extent.

25       Q.   Has he ever been placed in any program, any kind

1    of program, before?

2         A.    To my knowledge, no, he has never been placed in

3    any type of facility or program.

4         Q.    Would that make him more appropriate, then, for

5    Caprock?

6         A.    I would think so.  Obviously what has happened

7    before wasn't working, so being that he hasn't had that

8    opportunity to be in a placement, and hasn't received that

9    level of care, it does make him appropriate for us.

10        Q.    And then when we're talking about the length of

11   placement, there is no -- it's not a finite length, it can --

12   he can stay there as long as he's following the rules and the

13   Court allows him to stay there?

14        A.    Correct.

15        Q.    Okay.

16             MR. LAICHE:  Thank you very much, Your Honor.  I

17   don't have any other questions.

18             THE COURT:  All right.

19             Ms. Riewerts, any cross-examination?

20             MS. RIEWERTS:  I do have a short cross-

21   examination, Your Honor.

22             THE COURT:  All right.  You may begin.

23             MS. RIEWERTS:  May I proceed?

24             THE COURT:  Yes, you may.

25             MS. RIEWERTS:  Thank you.

1              CROSS-EXAMINATION

2        BY MS. RIEWERTS:

3        Q.    Good afternoon, Doctor Botkin.

4        A.    Good afternoon.

5        Q.    You and I have spoken on the phone previously this

6   spring, correct?

7        A.    Correct.

8        Q.    And I very much appreciated your -- your time with

9   Mr. Laiche and (unintelligible) taking the time to make that

10  connection --

11       A.    (Unintelligible).

12       Q.    -- so that I could ask questions about the

13  program.

14       A.    Of course.

15       Q.    When you (unintelligible) in April of this year,

16  again today when you testified, you talked about the fact

17  that there is no internet access at the facility, correct?

18       A.    There would be no internet access that would be

19  available for him to use, correct.

20       Q.    Thank you for that clarification.

21             With regard to that internet access that the staff

22  uses at the facility, is that Wi-Fi access that they use,

23  that is (unintelligible)?

24       A.    In some locations it has -- it has been, but like

25  I mentioned, it is in a staff office that is also kept behind

1    locked doors.  So the computers are locked, it's -- the

2    password has to be entered for the Wi-Fi to even access it,

3    and it's kept behind a locked door.

4          Q.    If I --

5          A.    There is (unintelligible) --

6          Q.    -- (unintelligible) --

7          A.    -- in place.

8          Q.    Okay.  And that's with regard to the Wi-Fi,

9    correct?

10         A.    Correct.

11         Q.    Okay.  If I visited your facility and I brought my

12   -- my iPhone with me, or some other sort of Android device --

13         A.    Uh-huh.

14         Q.    -- I could (unintelligible) my data package to

15   access the internet, correct?

16         A.    I guess technically you could, yes.

17         Q.    And I could also use my cell phone as a hotspot to

18   be able to access the internet, is that correct?

19         A.    I guess you could, yes.

20         Q.    When we spoke in April you had described that the

21   defendant would be at the highest level of restriction if he

22   were to be placed at your facility, correct?

23         A.    Correct.

24         Q.    And at the highest level of restriction he would

25   still have two roommates, is that correct?

1        A.   That is correct.

2        Q.   And since your agency specializes in the treatment

3   of behavioral disorders, including deviant sexual behavior as

4   you described earlier, it is possible that one or both of his

5   roommates would also have some sort of contact related to, or

6   some sort of -- and I'm not talking about hands-on contact

7   there, but some sort of either contact with the criminal

8   justice system or some other indicator (unintelligible)?

9        A.   What was that last part?  I'm sorry.

10       Q.   Some sort of contact with the criminal justice

11  system for a sex offense case, or some other indicator that

12  the (unintelligible) had a deviant sexual interest?

13       A.   Correct.

14       Q.   Okay.  And you had said during your testimony

15  today that there were approximately four to five clients

16  there currently who have engaged in similar behavior to the

17  defendant, meaning that they have engaged in online

18  communications involving the sexual exploitation of children?

19       A.   Correct.

20       Q.   And with those clients are they pending a criminal

21  proceeding, or are they -- has the criminal proceeding been

22  adjudicated?  If you know.

23       A.   They have already gone through the criminal, that

24  process, so those ones, those individuals, through the course

25  of that court case, were actually sentenced to Caprock.  So

1    they are actually on probation and are -- their -- their

2    sentence was to reside in Caprock and participate in

3    treatment.

4        Q.    Okay.  So they have all been court ordered to be

5    at Caprock, is that right?

6        A.    Correct.

7        Q.    While the defendant would have two roommates, he

8    would be interacting with other individuals at the facility,

9    correct?

10       A.    Yes.

11       Q.    And that would include other clients, including

12   the clients that -- who have committed the same type of crime

13   that Mr. Harbin has?

14       A.    Yes.

15       Q.    And that includes clients who are not at the

16   highest level of restriction, correct?

17       A.    In some cases.  So typically the (unintelligible)

18   that are at a -- let me -- let me separate this for a minute.

19   While at the day program facility the same level of

20   supervision is provided to everybody.

21       Q.    Uh-huh.

22       A.    It's really within the residential setting, or

23   their access to the community, that varies based on that

24   level.  So he would not be residing with anybody that would

25   be on any different level than he has, and at day program the

1   expectations would be the same across the board for

2   everybody.

3         Q.   In that they were being supervised 24-7?

4         A.   Yes.

5         Q.   But as you were describing earlier, someone with

6   Mr. Harbin's restriction level would not be allowed to go on

7   a supervised trip to Walmart, for example, whereas someone

8   who was sort of at a lower restriction level might be allowed

9   to take that trip (unintelligible), correct?

10        A.   Right.   Correct.   And usually that would happen

11  after day program hours through the residential program of

12  it.   So maybe on weekends or, you know, whatever the case.

13        Q.   And the other clients who are in the program who

14  are at a lower restriction level --

15        A.   Uh-huh.

16        Q.   -- are some of them allowed to have either laptops

17  or iPads or any sort of cell phone or other digital storage

18  device?

19        A.   There are a couple who have laptops, but they have

20  to remain at their residence.   They are not able to bring

21  them to the day program facility.   That's to ensure that

22  nobody else has access to it.   So in his particular setting -

23  -

24        Q.   (Unintelligible) --

25        A.   -- where he was (unintelligible) --

1      Q.    What part --

2      A.    -- there would be an opportunity for that.

3      Q.    You said, I'm sorry, it cut out for a second.

4      A.    Okay.

5      Q.    You said there would not be any opportunity for

6  that?

7      A.    Right.

8      Q.    And also, and this is something that we discussed

9  back in April that you testified about today, as well, that

10  the individuals in your program have 24-7 surveillance, or

11  supervision basically, except when they are in their bedroom

12  or except when they are in the bathroom, is that correct?

13      A.    That is correct.

14      Q.    So when an individual at higher restriction is

15  sleeping in their bedroom, say for eight hours, they are not

16  being supervised during that time, is that right?

17      A.    During that time, there is not staff with them.

18  Overnight the -- however, the alarms are on their doors and

19  windows, so that's kind of the monitoring that we have.  So

20  if anybody even gets up to go to the restroom it's triggered

21  and our staff will come out and see what's going on.  But

22  there is not somebody physically in the bedroom with them.

23      Q.    All right.  I appreciate your clarifying that.

24      A.    Okay.

25            MS. RIEWERTS:  I have no further questions.  Thank

1   you so much, Doctor Botkin.

2            THE COURT:  All right.  Mr. Laiche, any redirect?

3            MR. LAICHE:  Yes.  Briefly.

4                       REDIRECT EXAMINATION

5       BY MR. LAICHE:

6       Q.   Doctor Botkin, is there a staff member at the

7   residence homes 24-7?

8       A.   Yes.

9       Q.   And we were discussing some other lower-level

10  clients, I mean, have you -- really, give me the probability

11  of how successful someone would be, a low-level client,

12  getting a cell phone device and smuggling it to Mr. Harbin

13  and letting Mr. Harbin use it.

14      A.   It wouldn't, because they still have the same

15  restrictions.  Just because they -- so when I say they're

16  lower-level what that means is they are given more

17  independence, if you will.  So they may, within their

18  residential setting, be in a host home, and so they might

19  have more time where they are not as directly supervised.

20  However, the phone call process is still the same, the

21  transportation and community supervision is still the same.

22  We still monitor all of their finances, phone calls are still

23  monitored, and any personal property that would be coming in,

24  or gifts, we're still all be going through, so that doesn't

25  change for anybody.  That's just a standard across the board.

1      Q.    And what security measures do you have in place to

2  prevent that from happening, some other client bringing --

3  smuggling an electronic device to Mr. Harbin?

4      A.    So, like I mentioned, any way for them to get

5  access to buying something like that would mean that my staff

6  would have to go out and personally buy it for them, which is

7  not going to happen, or they would have a family member bring

8  them something.  But when family members come in they are

9  required to turn over anything that they have, we go through

10  all their personal property.  Even if they come in and they

11  bring somebody a letter, we read the letters to make sure

12  that there's nothing inappropriate in there or that there is

13  no discussion to try to set something up.  So, really, the

14  chances of that happening are very, very, very, very small.

15      Q.    Then how often are the residential homes searched

16  or -- yeah, searched to ensure there are no --

17      A.    We can search them at any point time.  We do

18  residential inspections every month, and on every shift our

19  staff go through and they kind of look in the clients' rooms,

20  make sure things are good.

21            If we have any cause for concern we can do it more

22  frequently.  We've had some individuals in the past where

23  we've actually put on a schedule that we go through their

24  stuff, so that could be something that we could set up for

25  Mr. Harbin, that we would go through and check his belongings

1    on a regular basis.  We have the ability to do that.

2         Q.   So if a condition of his bail would be, say, daily

3    searches of his property, is that something Caprock can

4    accomplish?

5         A.   Yes.

6         Q.   All right.

7              MR. LAICHE:  Thank you very much, Your Honor.  I

8    have no other questions.

9              THE COURT:  All right.  You may step down, then,

10   Doctor Botkin.  Thank you.

11             THE WITNESS:  Thank you.

12        (Witness excused.)

13             THE COURT:  Any other witnesses, Mr. Laiche?

14             MR. LAICHE:  No.  No, Your Honor.

15             THE COURT:  Any other proffer, or anything?

16             MR. LAICHE:  Your Honor, you have the exhibits,

17   the four exhibits that we have submitted, excuse me, with our

18   motion.  No, sir, I don't have any other proffers or

19   documents or evidence.

20             THE COURT:  All right.

21             All right.  Ms. Riewerts, any proffer or anything

22   from the government?

23             MS. RIEWERTS:  Yes, Your Honor.  The government

24   does have information to proffer, which I noted was provided

25   overall in discovery to Mr. Laiche, but in a written format

1   to Mr. Laiche yesterday.

2        THE COURT:  All right.  You may proceed.

3        MR. LAICHE:  Thank you, Your Honor.

4        I would first ask that the Court take judicial

5   notice of the complaint affidavit in this case.  It's ECF

6   Docket Number 1-1.

7        THE COURT:  The Court will take judicial notice of

8   that document.

9        MS. RIEWERTS:  And for that reason, Your Honor, I

10  am not going to go through, sort of, the nitty-gritty of each

11  of the chats that are reflected in that document, but

12  instead, summarize the contact with the victims named in that

13  document and other victims that Mr. Harbin has had contact

14  with.

15       Your Honor, this investigation started when SCI

16  Grand Junction was reached out to by (unintelligible) Buffalo

17  division, after identifying an individual in Buffalo, an 8-

18  year-old girl, who the defendant had been in contact with.

19  The investigation began on January 2nd of this year when a

20  police department in New York was contacted by the family of

21  an 8-year-old girl who was referred to in the complaint

22  affidavit and throughout the proffer as Minor Number 1.

23       The exploitation was facilitated through the

24  mobile telephone application Instagram by an individual

25  utilizing the username Cute Boy 4110, which was able later to

1   be identified as an Instagram username that the defendant

2   uses.

3          Minor Number 1 was interviewed in January at a

4   child advocacy center in Buffalo, New York.  She explained

5   that she had installed the Instagram application on her

6   mobile phone and she followed two individuals, one of whom

7   was Cute Boy 4110.

8          With regard to those communications the individual

9   identified himself as David, which is Benjamin Harbin's

10  middle name, and told Minor Number 1 he was 24 years old.

11  Minor Number 1 further disclosed during the recorded

12  interview that Cute Boy had requested naked pictures of her,

13  including (unintelligible) and that she did take those

14  pictures and sent them to Cute Boy, as he requested.

15  She also said that Cute Boy 4110 sent her a picture of his

16  penis.

17         The forensic examination of Minor Number 1's cell

18  phone revealed that the communications between Cute Boy 4110,

19  who I'll refer to hereafter as "Cute Boy," and Minor Number 1

20  occurred between November 27th of 2017 and December 3rd of

21  2019.

22         The defendant used a picture of a puppy as his

23  Instagram profile with regard to that account, which is

24  significant given the fact that the individuals who he

25  primarily appears to be in contact with are under 12 years of

1    age.

2              In terms of those communications, they were also

3    recovered from the search warrant return for the Cute Boy

4    Instagram account.  From the conversation string it is clear

5    that photos were exchanged back and forth, although those

6    photos were not able to be recovered.

7              With regard to the photos, you can tell that

8    photos go back and forth, because there's a photo icon that

9    appears in the communications.  Unfortunately, as I said

10   earlier, the actual images were not able to be -- to be

11   recovered.

12             The conversations themselves appear, or excerpts

13   of the conversations themselves, appear in the complaint

14   affidavit, ECF 1-1, so I am not going to read through those

15   communications.  But to summarize, the server site records

16   show that the defendant states that his name is David, that

17   he was 24 years old, as he represented to the victim.

18             He told her, "I only like talking to younger

19   girls."

20             She initially said she was 12, and then she said

21   she was 8, after the defendant told her that he doesn't like

22   talking to girls that are older than 11 years old.  And this

23   little girl, in fact, was 8 years (unintelligible).

24   (Unintelligible) to communications, the defendant asked Minor

25   Number 1 to take a photo of her face, which she appeared to

1   do.  And the defendant appeared to reciprocate by sending a

2   photo of himself.

3           She was asked by the defendant if they could be

4   best friends and if she likes him.  He asked whether they

5   could be secret boyfriend and girlfriend.  And then once a

6   friendship was established, the defendant began

7   (unintelligible) specific requests of sexually explicit

8   content, and the context of the conversation clearly

9   corroborates the victim's account that the (unintelligible)

10  clearly corroborates the victim's account that she sent nude

11  photos of her pubic area to the defendant.

12          The defendant asked for photos of inside of her

13  undies.  He asks her to open her legs so that she can -- so

14  that he can see all of it, and he asks for pictures of her

15  private and her sexy private.

16      (Brief pause)

17          MS. RIEWERTS:  One child pornography image was

18  recovered from Minor Number 1's cell phone, however, based on

19  metadata with that image it was taken on a date that predates

20  the communication with the defendant, and by a the

21  (unintelligible) time period, and so it is uncertain that

22  this is one of the images that was sent to the defendant.

23          The complaint affidavit also includes information

24  about Minor Number 2.  And with regard to Minor Number 2, at

25  the time the complaint affidavit was sworn, Minor Number 2

1    had not yet been identified.  She has, at this point in time,

2    been identified.

3             And with regard to Minor Number 2, she had been

4    identified because Instagram had sent a cyber tip to the

5    national Center for Missing and Exploited Children.  So when

6    Special Agent Zappe sent his lead to Canada where the victim

7    lives, at that same point in time Nick Mac (phonetic) had

8    referred the lead to Canada, and said they were also working

9    to identify her.  So when they actually received the

10   collateral lead from Special Agent Zappe they had already

11   identified her and interviewed her.

12            So with regard to Minor Number 2, he communicated

13   with her between November 15th of 2019 and January 13th of

14   2020.  He introduced himself as David in the beginning stages

15   of the communications, similar to the communications with

16   Minor Number 1.  He asked to see her private on the first day

17   of communications.

18            Age wasn't specifically stated in the chats in the

19   first few days, but she did indicate that she was going to

20   remove her age from her profile, and she states a friend of

21   hers is a little younger.  And Harbin states, "Like, 8?"  And

22   she replies, "Yeah."  So he knew her approximate age.

23            And in terms of those communications, he tells her

24   that he loves that she doesn't have, quote, "Hair or boobs

25   yet," end quote.

1           He acknowledges that she goes to school.

2           Multiple pictures of her face and upper body are

3    shared, clearly depicting that she was a prepubescent minor.

4    Images were recovered from the chat exchanges with this

5    particular victim from the server site records.

6           He talks through with her how to digitally

7    penetrated herself, masturbate, and how to insert a pencil

8    into her vagina.  According to the records, video calls take

9    place immediately after they discuss showing their privates,

10   for example, on November 22nd of 2019.  And his desire to

11   watch her put a pencil in her, quote, "coochie," end quote,

12   on November 23rd of 2019.

13          It is -- and he asked her for a picture of

14   herself on December 18th of 2019.  He had asked to see her

15   sexy coochie, and she sends him a close-up of her nude, pubic

16   area.  And as I noted, Your Honor, she is now identified.

17          The review of the Instagram search warrant

18   reflected that the defendant had been in touch with many

19   different individuals, most of whom -- primarily those of

20   whom were younger females under the age of 12.

21          Special Agent Zappe describes that the defendant

22   used a technique commonly referred to as "grooming" to gain

23   their trust.  He would usually say that he was 27 or 24 years

24   old.  He was actually about 29 years old at the time of the

25   conversations.

1          He would ask the girls if they wanted to be his

2    secret friend, his secret girlfriend, or his secret BFF,

3    meaning best friends forever.

4          He asked the girls what they were wearing.  Once

5    they were comfortable sharing a picture of themselves with

6    clothes on, he would ask what they were wearing underneath.

7    He would request to see pictures of their underwear.  And

8    then he also would request and encourage the girls to engage

9    in sex acts by playing with themselves and then inserting

10   objects, such as a pencil or a marker, inside of their

11   vaginas.

12         With regard to the account, in several of the

13   pictures sent by the defendant using the (unintelligible)

14   4110 Instagram account, his face is fully visible and

15   identifiable, including in images that he sent of himself to

16   Minor Number 2.

17         In terms of the communications, Special Agent

18   Zappe has gone through the communications and we're still in

19   the process of trying to identify many of the minor females

20   with (unintelligible) the defendant communicated

21   (unintelligible).

22         With regard to the sharing of explicit content,

23   even though that content was not necessarily recovered, or in

24   chatting about sexual activity, this type of conduct was

25   engaged in with about 10 minor female victims, including

1   Minor Number 1, Minor Number 2, and Minors 3, and 4, who I

2   will describe.  In terms of chatting of a sexualized nature

3   regarding what they sleep in, whether he can see their

4   underwear, but there's no indication that they actually

5   showed photos.  That's an additional approximately 13

6   (unintelligible) minor, female victims, including the Spokane

7   minor victim who is described in the criminal complaint.

8           And then with regard to chatting or grooming but

9   no sexting or short exchanges that didn't go anywhere, there

10   were approximately another 50 users who the defendant was in

11   communication with, primarily younger females under the age

12   of 12.

13           With regard to Minor Number 3 and Minor Number 4,

14   there are not any current charges pending with regard to

15   Minor Number 3 and Minor Number 4.  Discovery has been

16   produced to the defendant with regard to both of these

17   victims.  At this time the material has been provided as

18   evidence under Federal Rule of Evidence 414 and 404(B).

19           With regard to Minor Number 3, I'm just going to

20   give a short overview of the information related to her.  She

21   is 9 years of age, or was 9 years of age when the defendant

22   made contact with her.  She messaged with the defendant from

23   late October through December of 2019.  The Instagram search

24   warrant results reflect that the conversations were of a

25   sexual nature --

1           MR. LAICHE:  Ms. Riewerts --

2           MS. RIEWERTS:  -- (unintelligible) video

3    (unintelligible) --

4           MR. LAICHE:  Ms. Riewerts, can I -- I don't mean

5    to interrupt you.  But, Your Honor, I noticed there's someone

6    who has joined the meeting and I don't know who that person

7    is, and if we can identify him?  I'm sorry, Ms. Riewerts, for

8    --

9           THE COURT:  Ms. Burke, do you know --

10          MR. LAICHE:  -- interrupting you.  But if we could

11   find out who this other gentleman is?  There may be some

12   issues regarding Mr. Harbins' safety, and I don't want to

13   place that at risk by --

14          THE COURT:  Mr. Laiche, I can -- Mr. Laiche, I can

15   answer your question.  That is my -- I have a 1:30 set for an

16   initial appearance, Ms. Holland.

17          MR. LAICHE:  Okay.

18          THE COURT:  So that's a defendant who is in the La

19   Plata County Detention Center, which wouldn't be any

20   different if they were here waiting in the courtroom while we

21   were doing this, so just -- just for that identification.

22   All right?

23          MR. LAICHE:  Thank you.

24          Ms. Riewerts, I'm sorry for interrupting you.

25          THE COURT:  All right, Ms. Riewerts.

1          MS. RIEWERTS:  No worries at all, Mr. Laiche.

2          THE COURT:  You can continue.

3          MS. RIEWERTS:  Thank you, Your Honor.

4          The (unintelligible) video of himself

5    masturbating.  He makes references to having seen her vagina.

6    Those, given some of the method of communication and the fact

7    that it appears the victim deleted some of the images, no

8    such images have been recovered from her phone or from his

9    Instagram accounts.

10          He asked her to engage in multiple sexual acts,

11   including asking her if she would lick his penis and whether

12   she would want her vagina to be licked.

13          I will be clear, however, that that victim also

14   lives overseas and the defendant did not make a plan to

15   travel to meet her or anything of that nature.

16          Minor Number 4 has been identified and

17   interviewed.  She was 7 years of (unintelligible) at the time

18   she communicated with the defendant through his Instagram

19   account, as reflected by the search warrant results, from

20   late December 2019 to early January 2020.

21          After she let him know she was 7, he asked her if

22   she ever played with her private.  She replied, "Yes."  He

23   asked her she was playing with her private now and asked if

24   he could see and said he would play with his.  She sends a

25   picture that appears to be responsive to the request, her

1   hand is on her bare groin area.

2          During her interview, because she has been

3   identified, she confirmed that she had sent photos to one of

4   two strangers she was in communication with.  She could not

5   remember the username of the stranger she sent pictures to,

6   and she was uncomfortable discussing what body parts she had

7   sent pictures of, but circled the breasts and vagina on a

8   diagram of a female body as to what she sent pictures of.

9          With regard to the pictures that were able to be

10  recovered from the Cute Boy Instagram account, or from the

11  defendant's Instagram account, they reflected that she had

12  sent him pictures, including a picture of her bare buttocks.

13  He then sent a picture of his buttocks.  She sent a picture

14  of her groin area with her panties pulled away, and then her

15  nude pubic area was exposed, and he sent her a picture to her

16  of his erect penis.  Again, she was 7 years old.

17         I'm going to speak very briefly to the Washington

18  state victim.  That investigation is described in the

19  complaint affidavit.  And those -- what occurred with the 7-

20  year-old victim in Washington state is not able to be charged

21  under federal law, but he was in communication with her

22  asking her to take pictures of herself in her pajamas and

23  asking her to take pictures of herself in her underwear.  And

24  it was the detective who investigated that case that

25  telephoned an individual who identified himself as Benjamin

1   Harbin, via telephone, and conducted a telephonic interview.

2          The defendant denied at that time having a cell

3   phone and using the computer, as he stated it was against his

4   conditions of probation.  He denied using Instagram, but

5   during the call his mother interjected on the call and

6   confirmed that the defendant lived with his father at the

7   address where his father lives and she said there was a

8   desktop computer at the residence but the defendant was not

9   allowed to use it due to his current conditions of probation.

10          Due to the disclosure of the 7-year-old minor to

11   the law enforcement in Washington state, Detective Humphrey

12   (phonetic) then contacted Probation Officer Dow, who was

13   referred to earlier during Doctor Botkin's testimony.  And

14   based on the reported conduct the probation officer requested

15   an arrest warrant from the state district judge for the crime

16   of violating probation.

17          When the defendant was arrested on March 3rd,

18   without incident, he was in jail for a short period of time.

19   When he was in jail during that time there was a recorded

20   phone call with his father on March 6th of 2020.  They have a

21   conversation during which the father reminds the defendant

22   that the call is being recorded, and they're talking about --

23   they're talking about the case without talking about

24   specifics.

25          But at the very end of the phone call the

1   defendant asks his father twice, "Can you do something for

2   me?"  And his father says, "What is that?"

3           And I would just note that this is not an official

4   transcription of the recording.  This is me listening to the

5   phone call and jotting down notes about what was said.

6           The defendant then says, "Can you go in my room

7   and get something -- get rid of something?"

8           Dad then says, "Ah, recorded, Bud."

9           Defendant says, "Okay."

10          There's a pause, and then his father sort of

11  stutters a little bit and says, "Like what?  Well, I mean,

12  not like what, but, you know, where are you talking about?"

13          The defendant says, "Do you know where my TV is?"

14          Dad says, "Yeah."

15          And Defendant (unintelligible) the left."

16          Dad says, "Okay."

17          The defendant says, "All the way out."

18          Dad say, "All right.  Well, all right."

19          And again, like, at this point in time, you know,

20  there are no charges pending in terms of any sort of -- you

21  know, we don't know what was in that drawer, but I would

22  submit to Your Honor that what was in that drawer was one of

23  the digital storage devices that he was using to communicate

24  with victims in these cases.  And not surprisingly, when a

25  federal search warrant was executed at the defendant's home

1  where he lived with his father, no digital storage devices

2  were recovered, with the exception of the computer tower that

3  was described by the defendant's mother earlier.

4          However, there is ample evidence in this case that

5  the defendant has had access to at least four different

6  digital storage devices which would have provided him with

7  the ability to communicate online via the Instagram accounts.

8  And I think it's these four devices that show the difficulty

9  in monitoring the defendant in any way successfully, given

10  his technological savvy and his surreptitious ability to gain

11  access to these devices.

12          One was a receipt -- one device that was not

13  recovered, but that there is evidence that exists, was a

14  prepaid AT&T radiant cell phone purchased on January 17th,

15  2020 from Walmart.  Special Agent Zappe went to the Walmart

16  to see if there was any video surveillance of the phone and

17  the calling card that was also recovered being purchased.

18  And I would note that the calling card was located in the box

19  spring mattress in the defendant's bedroom.  The cloth on the

20  box spring had been cut and the card was tucked inside the

21  box spring mattress.

22          When Special Agent Zappe went to Walmart there was

23  video footage that was still available of a white male

24  matching Harbin's description purchasing an item that was a

25  small boxed package, and another item that was the size of an

1   index card.

2            During the search there was also a box, an empty

3   box for an Apple iPad Pro that was recovered from the

4   defendant's bedroom.  There was also a receipt for the

5   layaway purchase of an Apple iPad Touch Fifth Generation from

6   a pawnshop which was -- the receipt was recovered from the

7   defendant's vehicle.

8            Special Agent Zappe, Z-A-P-P-E, interviewed the

9   manager at the pawnshop that the receipt was for and he

10  confirmed that Benjamin David Harbin, and then gave the

11  father's address where the defendant lived with his father,

12  completed the purchase of an Apple iPod Touch Fifth

13  Generation on March 11th of 2019.

14           And review of the metadata, this is the fourth

15  device that we are aware of that was not able to be

16  recovered, there is metadata associated with one of the

17  masturbation videos that was sent which depicts the

18  defendant's face which was sent to Minor Number 3.  And the

19  metadata in that video reflects that the video was created

20  with an iPad Mini Two.

21           I would also note that Special Agent Zappe

22  followed up with Probation Officer Candace Dow, who was

23  assigned to oversee the probation of the defendant as

24  described earlier by Doctor Botkin.  Because the defendant

25  was ordered to have 24-7 supervision by one of his parents as

1   part of probation, he spent time with his mother at her house

2   when the defendant's father was working during the day,

3   according to Probation Officer Dow, and his mother also told

4   U.S. Probation Officer Dibsie that the defendant had 24-7

5   care as per the pretrial services report.

6           When Probation Officer Dow discussed the

7   Washington state investigation with the defendant, the

8   defendant told Probation Officer Dow that he got rid of his

9   phone (unintelligible) also stated that his mother and father

10  conducted a search of the house and could not find a phone.

11          With regard to one last category of evidence I

12  wanted to share with Your Honor the defendant's prior

13  contacts with the criminal justice system.  Some of these are

14  included in the pretrial services report.

15          With regard to the Mesa County, Colorado

16  (unintelligible) 2018, possession of child demography

17  conviction, the conduct underlying that arrest was that a

18  search warrant had been executed of the defendant's home in

19  the District of Colorado after he had been in contact with a

20  9-year-old girl using a program called Musical.ly, M-U-S-I-C-

21  A-L, period, L-Y, which appears to have been a predecessor to

22  TicTok.  He had sent her a picture of himself sitting on the

23  toilet with his genitals showing.  So that was one of the

24  cases in which he was sentenced to 10 years of intensive

25  supervised sex offender probation.

1        With regard to his Kansas case, his conviction for

2   electronic solicitation and child (unintelligible) under age

3   16, and attempted sexual exploitation of a child in Kansas,

4   the underlying conduct for that was that the defendant had

5   contacted an 8-year-old girl in Kansas who the defendant

6   communicated with on Google Hangouts.  This conduct postdated

7   the execution of the search warrant in the charged Mesa

8   County case, and based on the records currently available he

9   had sexually explicit conversations with the victim and sent

10  her images of his penis which were recovered on the victim's

11  phone by her mother.

12       I would note for the Court that one or both of the

13  prior state offense convictions will significantly increase

14  the statutory mandatory minimum sentence in this case.  For

15  production of child pornography the defendant will face

16  either a 25 or 35-year mandatory minimum sentence, for

17  receipt of child pornography the defendant will face a 15-

18  year mandatory minimum sentence, although the defendant's

19  convictions do not appear to trigger the mandatory life

20  sentence for repeated sex offenders under 18 United States

21  Code Section 3559(e).

22       With regard to the defendant's contacts with the

23  criminal justice system.  There were also investigations

24  based on police records that were conducted in Mesa County in

25  2013 and in 2015, which the -- which involved the defendant.

1          The 2013 case was a cyber tip after a phone number

2     associated with the defendant uploaded (unintelligible) of

3     child pornography.  The defendant in that investigation

4     admitted to receiving two images of child pornography in his

5     email from an unknown sender and denied requesting images.

6     The case was closed, citing lack of evidence.

7          In 2015, the defendant was investigated for

8     communicating with a 9-year-old girl on Google Hangouts.  The

9     dialogue involved, according to records, quote, "grooming,"

10    end quote.  The (unintelligible) images exchanged.  The

11    defendant did not cooperate with an interview and the case

12    was closed.

13         In July of 2014, Harbin was, quote, "trespassed,"

14    end quote, from a public swimming pool in Grand Junction,

15    meaning that he was told he could no longer go to the pool

16    (unintelligible) he caused prepubescent minor girls to feel

17    uncomfortable.  It was reported that he had engaged in

18    horseplay with girls two years earlier who were approximately

19    8 years of age at that time.  That the defendant would throw

20    them up in the air and generally wrestle with them in the

21    water, and that he would help the girls adjust their

22    swimsuits and (unintelligible) and that in doing so he had

23    touched her private parts.

24         That's the end of the government's proffer of

25    evidence, Your Honor.  Thank you.

1          THE COURT:  Let me ask you, Ms. Riewerts, this is

2   a presumptive case, is that correct?

3          MS. RIEWERTS:  That is correct, Your Honor.  The

4   rebuttable presumption applies both to 18 United States Code

5   Section 2251(a), to 2422(b), and then also to transportation

6   of child pornography, which is Count 5 of the indictment.

7          THE COURT:  All right.  Thank you.

8          I'd like to ask Ms. Dibsie of the Probation

9   Office, what is the Probation Office's view of whether or not

10  there are conditions that will assure the safety of the

11  community, as well as his continued appearance here in court?

12  Ms. Dibsie?

13         MS. DIBSIE:  Thank you, Your Honor.

14         In addition to the pretrial report completed back

15  in April, we did speak with Caprock and confirmed much of the

16  information that Doctor Botkin covered today.  I'm going to

17  leave this up to the Court's discretion.  If he is released

18  we will supervise him in conjunction with state probation, as

19  well as Caprock.

20         THE COURT:  All right.  Thank you.

21         All right.  In order to sustain a motion for --

22         Let me ask you to mute your microphones so we

23  don't get some feedback.

24         In order to sustain a motion for detention the

25  government must establish that there is no condition or

1  combination of conditions which can be imposed in connection

2  with the pretrial release condition or a combination of

3  conditions which could be imposed in condition with pretrial

4  release that would reasonably ensure the safety of any other

5  person or the community.

6            The former element must be established by a

7  preponderance of evidence, and while the latter requires

8  proof of clear and convincing evidence.  However, in this

9  case there is a presumption, a rebuttable presumption, that

10  there are no conditions that the Court can place on the

11  defendant to assure -- reasonably assure the appearance of

12  the person, as well as the safety of the community.

13            Now, the (unintelligible) the Court to consider

14  the following factors in determining whether there are

15  conditions that will reasonably assure the appearance of the

16  defendant as required and the safety of any other person in

17  the community.

18            First, I find that the defendant has rebutted the

19  presumption in that there, through Caprock Behavioral there

20  are some conditions available to place the defendant.  But I

21  also need to look at the nature and circumstances of the

22  offenses charged, including whether the offense is a crime of

23  violence, and in this case the defendant is charged with

24  several charges of inducing minors to engage in sexual acts,

25  as well as child pornography possession and receipt.

1           I need to weigh the evidence against the person,

2   the history and characteristics of the person, including

3   their character, physical and mental condition, family ties,

4   whether they are employed, their financial resources, length

5   of residence in the community, community ties, past conduct,

6   any history relating to drug or alcohol abuse, their criminal

7   history and record concerning appearance at court

8   proceedings, and whether at the time of the current offense

9   or arrest the person was on probation, on parole, or other

10   release pending trial, sentencing, appeal, or a completion of

11   a sentence for an offense under federal, state, or local law.

12           In looking at the pretrial services report I note

13   that the defendant has prior convictions, including felonies

14   of a sexual nature, similar to the current charges that he is

15   being faced now, in federal court.

16           That the nature and seriousness of the danger to

17   any person in the community that could be imposed if I were

18   to release him.

19           In making my findings of fact I've taken judicial

20   notice of the information set forth in the pretrial services

21   report, in the entire court file, as well as taken judicial

22   notice of the indictment, and the review of the defendant's

23   motion, as well as his exhibits.  And I have taken into

24   consideration the testimony presented of Doctor Botkin during

25   this contention hearing, as well as the arguments of counsel.

1          Weighing the statutory factors set forth in the

2   Bail Reform Act I find the following:

3          First, the defendant's been charged with multiple

4   counts of sexual offenses of which the most serious count

5   carries with it a minimum mandatory sentence of 15 years.

6   And as the government noted, that may increase substantially

7   given the fact that the defendant has previous felonies of a

8   sexual nature.

9          I note that the defendant was on probation when

10  the current indicted crimes were charged.  I note that he was

11  ordered to intensive supervised sexual offender probation of

12  which he failed to appoint where a warrant for failure to

13  comply with entered, and that the alleged current crimes were

14  committed while the defendant was under that intensive court

15  supervision.

16          The Court finds that the defendant has previous

17  felonies, as mentioned earlier.  And the disturbing thing to

18  the Court is that they are all of a sexual nature and all of

19  the same type of crime.  What's of grave concern to the Court

20  also is the length that the defendant has gone in using

21  electronic media and electronic devices in order to contact

22  past victims, as well as the alleged victims in the current

23  case.

24          As a result of this, the defendant's criminal

25  history, the fact that he was on probation, and not just

1    probation but in the Court's words, extensive sexual offender

2    probation, and not only failed to comply, but was under a

3    warrant when the current alleged crimes committed, I find

4    that concerning those factors there is a clear and convincing

5    evidence that no condition or combination of conditions for

6    release will reasonably ensure the safety of the community.

7              I further find that by a preponderance of evidence

8    that no condition or combination of conditions of release

9    will reasonably assure the appearance of Defendant based on

10   the fact that he has failed to comply with court orders in

11   the past.

12             Therefore, the defendant will remain in custody of

13   the United States Marshals pending the outcome of the current

14   charges.

15             With that, Mr. Laiche, does the defense have any

16   clarifications or anything further for the Court to consider?

17             MR. LAICHE:  No.  Thank you, Your Honor.

18             THE COURT:  All right.

19             How about from the government, Ms. Riewerts?

20        (Brief pause)

21             MS. RIEWERTS:  Sorry.  I apologize.  I was on

22   mute.

23             No.  Thank you, Your Honor.

24             THE COURT:  All right.  Then the defendant will

25   remain in the custody of the United States Marshals.

1          I'd like to thank Doctor Botkin.  I appreciate the

2    service that they provide, I think it's a valuable service,

3    however I think it's more tailored for post-conviction type

4    as opposed to pretrial conviction, or pre-conviction.  But

5    nonetheless, I appreciate the service and the Court

6    recognizes that you're contributing a valuable service for

7    the community.  So I appreciate that, Doctor Botkin.

8          With that, we will be in recess.

9          THE COURT CLERK:  All rise.

10          MR. LAICHE:  Thank you, Your Honor.

11              (Time noted:  1:53 p.m.)

12                  * * * * *

13                  CERTIFICATE

14      I, RANDEL RAISON, certify that the foregoing is a

15    correct transcript from the official electronic sound

16    recording of the proceedings in the above-entitled matter, to

17    the best of my ability.

18

19

20    _____          February 2, 2021

21    Randel Raison

22

23

24

25